FILED'08 JUN 27 14:44USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ALLSTATE INSURANCE COMPANY,
an Illinois corporation,

                Plaintiff,

      v.

RALPH B. BREEDEN,

                Defendant.

CV. 01-1686-AS

FINDINGS AND
RECOMMENDATION

ACOSTA, Magistrate Judge:

*Findings and Recommendation*

      The parties' cross-motions for summary judgment are now before the district court for the

fourth time. Plaintiff Allstate Insurance Company ("Allstate") asks the court to reconsider its denial

of Allstate's motion for summary judgment on defendant Ralph Breeden's ("Breeden") second

affirmative defense of equitable estoppel and fourth affirmative defense of improper reliance.

Breeden asks the court to again address his arguments with regard to O.R.S. 742.208 and O.R.S.

742.200 or, alternatively, asks the court to certify these questions to the Oregon Supreme Court along with the question of whether an insured is entitled to emotional distress damages on a breach of contract claim. For reasons set out below, the court recommends that both parties' motions be denied.

*Background*

This case arises from Allstate's denial of Breeden's claim under a homeowner's insurance policy for property loss caused by a June 2000 fire in Breeden's home. Allstate filed this lawsuit in November 2001 to obtain declaratory judgment that Breeden's alleged fraud or concealment voided its coverage obligation under the policy, and because the policy excluded from coverage the alleged cause of the fire. Breeden denied Allstate's allegations and asserted as affirmative defenses or counterclaims against Allstate breach of contract, bad faith or negligent administration of the insurance policy, intentional infliction of emotional distress, and violation of its statutory obligation to provide the specific reasons for its coverage denial. In February of this year Allstate amended its complaint to omit its claim for relief that the policy excluded the cause of the fire from coverage.

In the years the case has been pending, in addition to the summary judgment motions, the parties have filed motions to compel, to dismiss, for a more definite statement, for a protective order, to take additional depositions, and for relief from opinion and order. In addition, the Ninth Circuit Court of Appeals twice heard appeals of the district court's summary judgment rulings, once in 2002, which appeal the Ninth Circuit decided in 2004, and once in 2005, which appeal it decided in 2005. In the latter appeal, the Ninth Circuit affirmed summary judgment on Breeden's fourth counterclaim alleging that Allstate violated its statutory obligation to provide the specific reasons for its coverage denial.

Following the 2005 appellate decision, the parties resurrected, for a third time, their summary judgment motions filed in July 2002, which the district court decided in December 2007.  In that decision, the district court granted Allstate's motion with regard to Breeden's Second and Third Counterclaims, and First and Third Affirmative Defenses, and also his claim for emotional distress damages under his First Counterclaim for breach of contract.  The district court subsequently denied Breeden's "Motion for Relief from Opinion and Order" regarding these rulings.

The current motions relate to issues that, according to the parties, either were not resolved by the Ninth Circuit's prior decisions or the district court's prior rulings, or which arise from Allstate's February 2008 amended complaint.[1]

*Legal Standard*

1. Motion for Reconsideration

A party may seek reconsideration of a ruling on a summary judgment motion under either Fed. R. Civ. P. 59(e) or Fed. R. Civ. P. 60(b).  A motion for reconsideration under Fed. R. Civ. P. 59(e) must be filed within 10 days after entry of the judgment while motions under Fed. R. Civ. P. 60(b) must be filed within a reasonable time, with an outside limit of one year after entry of judgment for motions brought under subsections (1) through (3) of Rule 60(b).

The district court generally applies the same analysis under both rules, and its decision is reviewed for abuse of discretion.  *See Fidelity Federal Bank, F.S.B. v. Durga Ma Corp.*, 387 F.3d 1021, 1023 (9th Cir. 2004)(discussing Rule 60(b)); *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1441 (9th Cir. 1991)(discussing Rule 59(e)).  Three major grounds justify reconsideration: "the district court

---

[1]    In its prior opinions the court fully described in detail the facts underlying the parties' dispute, so there is no need to repeat them again here.

(1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *School Dist. No. 1J, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993)(citing *All Hawaii Tours, Corp. v. Polynesian Cultural Center*, 116 F.R.D. 645, 648 (D. Hawaii 1987), *rev'd on other grounds*, 855 F.2d 860 (9th Cir. 1988)). Reconsideration is the exception; as the Ninth Circuit has observed, reconsideration is warranted only by these and "[o]ther, highly unusual, circumstances." *School Dist. No. 1J*, 5 F.3d at 1263. *See also Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003)(noting that Rule 59(e) "offers an 'extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources,'" *citing* 12 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 59.30[4] (3d ed. 2000)).

Rule 60(b)(1) specifically allows a court to correct a final judgment where the judgment was based on "mistake, inadvertence, surprise or excusable neglect." However, the parties are limited to the arguments previously made and addressed by the court. "A motion for reconsideration is an improper vehicle to tender new legal theories not raised in opposition to summary judgment." *All Hawaii Tours*, 116 F.R.D. at 650. The decision to correct a judgment for mistake or inadvertence, whether made by a party or the court, rests in the discretion of the trial court. *Fidelity Federal Bank, F.S.B.*, 387 F.3d at 1024.

Rule 60(b) contains a catchall provision, found in subsection six, which allows a court to correct a judgment "for any other reason that justifies relief." To qualify for relief under this provision, a party must "establish the existence of extraordinary circumstances which prevented or rendered him unable to prosecute an appeal." *Martella v. Marine Cooks & Stewards Union, Seafarers Int'l. of North America*, 448 F.2d 729, 730 (9th Cir. 1971).

## 2. Motion to Certify Questions to the Oregon Supreme Court

The Oregon legislature has created a procedure by which a federal court may "certify" a

question of state law to the Oregon Supreme Court if resolution of the question would be

"determinative of the cause then pending in the certifying court" and "there is no controlling

precedent in the decisions of the Supreme Court and the intermediate appellate courts of this State."

O.R.S. 28.200. A party seeking certification of a unique state law issue must file and serve a motion

showing that the question has met five criteria:

> (1) The certification must come from a designated court; (2) the question must be one
> of law; (3) the applicable law must be Oregon law; (4) the question must be one that
> "may be determinative of the cause;" and (5) it must appear to the certifying court
> that there is no controlling precedent in the decisions of the [Oregon Supreme Court]
> or the Oregon Court of Appeals.

*Western Helicopter Servs. Inc. v. Rogerson Aircraft Corp.*, 311 Or. 361, 364 (1991)(citing O.R.S.

28.200)(standard adopted by this court as noted in LR 83.15(a)). All of the requirements must be

met or certification will be denied. *Id.* at 366. The decision to certify a question of state law to the

highest court of the state "rests in the sound discretion of the federal court." *Micomonaco v. State*

*of Washington*, 45 F.3d 316, 322 (9th Cir. 1995)(quoting *Lehman Bros. v. Schein*, 416 U.S. 386, 391

(1974)).

*Discussion*

## 1. Allstate's Motion for Reconsideration

### a. Breeden's Second Affirmative Defense: Equitable Estoppel

Allstate asserts that the district court erred in denying its motion for summary judgment on

Breeden's affirmative defense of equitable estoppel. Allstate alleges that Breeden "willfully

concealed or misrepresented material facts or circumstances concerning the subject of this insurance,

including the existence, quantity, quality, character and value of personal property claimed as loss."

(Am. Compl. ¶ 51.)[2]  In his second affirmative defense, Breeden contends that he "relied upon and

followed the instructions and advice of Allstate's own agents in the preparation of his claims and

schedules.  Allstate is estopped from complaining about the manner in which Defendant prepared

his claim schedules." (Answer and Counterclaims ¶ 48).

> To establish equitable estoppel under Oregon law:
>
> "[t]here must be (1) a false representation; (2) it must be made with knowledge of the
> facts; (3) the other party must have been ignorant of the truth; (4) it must have been
> made with the intention that it should be acted upon by the other party; and (5) the
> other party must have been induced to act upon it."

Day v. Advanced M&D Sales, 336 Or. 511, 518-19 (2004) (citations omitted).  Allstate argues that

the evidence is not sufficient to establish any of the elements of estoppel.   Specifically, Allstate

contends that there is no evidence in the record that Allstate agents made false representations to

Breeden on the issue of preparing the personal property inventories, or that Breeden was ignorant

of the truth, or that Breeden relied on the representations in preparing the inventories.

The terms of the insurance policy required Breeden to provide Allstate with "a detailed list

of the damaged, destroyed or stolen property, showing the quantity, cost, actual cash value and the

amount of loss claimed." (Policy, Section I(3)(c).)  Allstate agent Greg Richards advised Breeden

on how to complete the inventory.  Richards told Breeden to include personal property belonging

to Brady and Tyler Hardin, his ex-fiancee's children, as well as bump up the value of his personal

property. Breeden remembered that his daughter, Carlie, and his ex-fiancee's daughter, Jessica, were

present during the conversation.

---

[2]Allstate filed a Second Amended Complaint after the filing of the Opinion and Order
under reconsideration but did not alter this allegation in any way.

In his deposition taken on July 5, 2002, Breeden recounted the conversation he had with

Richards regarding the inventory:

Q.    What did Mr. Richards tell you about completing your contents inventory?

A.    Many different things.

Q.    Well, what's one thing he told you?

A.    To do a thorough job. He told me that no matter what, you know, that in the
end, you can't replace all of your personal items, like my kids' pictures and stuff like
that, that basically it would be like negatives – not negatives, but what did he say,
replace it with rolls of film, which, you know, that's understandable. You can't
recoup stuff like that.

Q.    Okay. Did he tell you anything else about completing an inventory?

A.    Yeah. He told me to include Brady's and Tyler's stuff on there and I didn't
do that.

Q.    Did he say why you should include their stuff?

A.    Pardon me?

Q.    Did he say why you should include their stuff?

A.    Well, we talked about Kim's coverage and so on and so forth and basically
I think he was trying to be a mister nice guy and said, "Oh, I'll just put it in with the
rest of your kid's stuff," and I didn't think that would be right.

Q.    Okay. What else did he tell you about filling out a contents inventory?

A.    Well, let me see. I think Carlie was sitting there and I think he said that he
could bump it up and I didn't do that either.

Q.    What do you mean when you say "bump it up"?

A.    Well, he made some comment like 20 to 30 percent, if I remember correctly.
It's been quite a while, but I remember him saying that. I do believe Jessica was
sitting in there, too. That was Kim Harden's [sic] daughter.

Q.    Is her last name Harden [sic]?

A.      I think it's Ray.

Q.      What else did he tell you about filling out a contents inventory?

A.      If I remember correctly, he was talking about – he was telling me this one fellow that had an instance that this guy had like a drill and his neighbor came over and said it was a Craftsman drill and they replaced it with a Craftsman drill instead of a Black & Decker.

(Lauersdorf Aff. Ex. 19 Page 15-16.)

He described his conversations with Richards in a similar manner in his Affidavit in Support

of his Motion for Partial Summary Judgment.

14.     I met and spoke with Mr. Greg Richards shortly after the fire.  Mr. Richards is an Allstate agent in Albany, Oregon.  I met with him several times over the next few months.  He explained a number of things about how the Allstate claims process works.

15.     Mr. Richards told me that with a house of my size, and with the number of people living there, Allstate would expect that I would have contents worth $80,000 to $120,000.  He also said that even though I thought I had replacement cost coverage on the contents of my home, Allstate would not pay me replacement cost for my contents.  He said they would depreciate the value of everything, and pay me only the depreciated value, which is usually only 20-30% of what it cost.  He explained they would pay me more, only if and when I actually replaced particular items which we lost.

16.     Mr. Richards gave me forms to use to list the contents of the home.  He explained that anything we owned which we did not list on the forms would never be paid for.  He advised us to put down the cost of each item.  I told him that would be almost impossible, because no one could remember the price they paid for everything they owned.  He said it would be acceptable to find the current prices from catalogues and the stores.  He also told us there would be many items which we would forget about until after we settled the claims.  He told us to add 10% to the items on the list to cover those things.  I decided not to do that, however.

17.     Mr. Richards also talked with us about the property of Kim Hardin which had been destroyed by the fire.  Ms. Hardin had been my fiancee and my part-time assistant in a construction business which I had been conducting.  She and I had lived together as a couple for approximately a year prior to the fire.  She had three children from a previous marriage, one of whom was severely disabled with cerebral palsy.

Mr. [sic] Hardin and I had decided to separate shortly before the fire occurred. We remained friends, and I still employed her as an assistant, but approximately one week prior to the fire she had moved into her own apartment. There was still a lot of her property in the home, however, at the time of the fire. It included her own clothes, those of her children, her children's toys and games, and much of the handicapped equipment for her disabled son, Brady. It would probably have cost $15,000 to $25,000 to replace her property alone.

18.    Mr. Richards told us that Allstate would probably not cover the property of Ms. Hardin, but that we should slip it in anyway. He did not tell us that I had the option under the policy to include her property as that of my guest. I did not learn that until after this case was filed.

(Breeden Aff. ¶¶ 14-18.) Breeden also specifically remembers Richards telling him to use

replacement values on the original inventory list:

Q.    Did Mr. Richards advise you to use replacement cost values on the first inventory list?

A.    Mr. Richards advised me to take the catalog prices and put them – to use them as my base value. Whether they're for original replacement, I really don't know. I just know that's what he told me he uses.

(Dickas Responding Aff. Ex. 6 Page 10.)

A number of people, including his children and his ex-fiancee, helped Breeden prepare the

original personal property inventory, which he provided to Allstate in mid-August, 2000.[3] Allstate

agent Ann Lewis reviewed the inventory and returned it to Breeden to amend. Breeden then

prepared and submitted an amended inventory. He explained that he realized the first inventory

contained exaggerations and duplications and he wanted to correct the errors. He then intentionally

---

[3] "I went over basically what I remembered I had, and Brandon worked with me and Carlie worked with me and this is what we came up with." (Blodget Aff. Ex. 40, Page 9.) "The first one I turned on was what – everybody including the kids, I had hired to help put that thing together." (Dickas Responding Aff. Ex. 5, Page 3.) "Ms. Hardin and I, and my children spent many weeks after that preparing lists of personal property we had lost in the fire." (Breeden Aff. ¶ 19.)

failed to report some property that he could have claimed to punish those individuals that had

exaggerated values or duplicated items on the first list:

> Q.    So what you're saying is that this inventories of loss, this is the final copy that you gave us, right?

> A.    Uh-huh.

> Q.    You're saying that this is missing anywhere from 80 to a hundred thousand dollars worth of property?

> A.    You asked me for retail prices. For garage sale prices, probably about another 20, $30,000 garage sale prices.

> Q.    How many items do you think are missing off of this inventory?

> A.    I would say 30 percent of my house is off of that inventory.

> Q.    What kind of items would those be?

> A.    Most of my clothes, most of Brandon's clothes, most of my tapes, most of my CDs, 20 percent of the household artifacts, prints, pictures, frames, games.

> Q.    Let me ask you why?

> A.    Why?

> Q.    Yes.

> A.    Because this is it. When I went over that first list and saw exaggeration on quite a few things, I got pissed off. I got pissed off at some of my friends and family and so I didn't include a lot of stuff in there because that's the punishment.

> Q.    Well, let's talk about that a little bit because what we had talked about earlier was some duplication and you had mentioned to me yesterday some exaggeration and now you've used the term "exaggeration" again. What do you mean when you say there's some exaggeration on the first list, which is Exhibit 62?

> A.    Well, there's a couple of – I think a down vest in there and there's a few pieces of clothing in there that's either been duplicated or added in that wasn't there. Basically, I see furniture that wasn't supposed to be in there. I see other things in there.

You know, if I went over it one for one for one for one I could write off the duplications, you know. If you give me a copy of that, I'd be more than happy to take it home, take a highlighter and mark all the ones in red highlight that are not in there.

And now – as for the CDs, like I said, roughly what I told Brandon to do is because he knew the names of the songs and stuff like that, some of those CDs I didn't have. But I don't know the difference between a Ray Charles CD that has this one song on it versus a Ray Charles CD that had the other song on it. I didn't know the titles. Same thing with ELO or Boston. If you show me the album cover, I might be able to tell you which songs are on it and which ones I had.

Q.      So there are CDs on there that you didn't have?

A.      That is correct. Roughly we had – probably for myself I would say I had my personal self, oh, about 110, 120 CDs. Brandon and Carlie – Brandon probably had maybe 65, 70 CDs. Carlie had maybe 15, 20 CDs. When you add them all up, they came out with like 250 CDs I do remember correctly, if that's close. I don't remember correctly. But, you know, CDs are a little bit of an exaggeration. We had that many, but I can't tell you if we had that many CDs. Movies – I can tell you just about the exact number of movies that I had.

Q.      I think that was originally reported for CDs was around 300 and the number that we just came up with is 210.

A.      Uh-huh.

Q.      Which do you think is more accurate?

A.      210. That's the reason why I said, if you look at my second contents list, I went over this exactly what was physically found on the property because, see, there is no exaggeration. If it isn't there, piss on them.

Q.      What about the numbers as far as prices? Do you think there's any exaggeration there on the first one, Exhibit 62?

A.      On this – Exhibit 62?

Q.      Yeah.

A.      Those are replacement prices.

Q.      Okay. Do you think they're all accurate?

A.      I would say plus or minus within 20, 30 cents. I mean, we went over catalogs and stuff like that. I went – for my own personal stuff I went and got the prices, * * * .

(Lauersdorf Aff. Ex. 21 Pages 6-9.) Breeden also indicated that the value of this two shelf stereos was excessive:

Q.      There's two Aiwa shelf stereos for $987.48.

A.      For how much?

Q.      $987.48.

A.      I didn't pay that much for it. That's a little bit outrageous. No. They should be about $300 each.

(Boldgett Aff. Ex. 40 Page 13.)

When asked to explain why the original list included additional items and exaggerated prices, Breeden explained that he had shared Richards's advice with the individuals helping him prepare the inventory, and that all of them followed that advice:

Q.      Okay. What do you think about the items in Exhibit 62 that you talked about earlier that were on there that shouldn't have been in there?

A.      Well, I think what they did is take Greg's comments as we brought them back out of context.

Q.      Can you explain that for me?

A.      Yeah. I'll tell you. Greg had made us quite aware just exactly what goes on, how it works and that to make sure you put the full maximum dollar amount that you can find for each item because they're going to take the age off and they're going to depreciate it and then they're going to give you "X" amount of money on the dollar for it. And, you know, I have an idea I should have never said that to anybody. I should have kept it as my own personal knowledge.

Q.      But I guess what I'm getting at is you mentioned a down parka and you mentioned some other items that you said you went through this and you noticed they were on there and you didn't --

A.    Right.  See, I had a down jacket, I had a down vest, I had another down jacket that was orange and I see a couple more in there than what was supposed to be in there.  Do you see what I'm saying?

Q.    Yeah.  That's what I'm getting at.  How do you think those got in there?

A.    Like I said, people exaggerated.  So --

Q.    Any idea who?

A.    Everybody.  That's being flat honest.

Q.    Any idea why?

A.    My exact reason is why, I told everybody just exactly what Greg said, that this is how they do it.  They said – they asked me how this works, and I says, "You make your list, put the catalog prices on it, Allstate will get it, then they'll take the age of it and they'll deduct that, then they'll take that price and deduct another section off of it and that's what you get."

Q.    Sure.  And that would explain using the catalog prices which may be more than actual value but that wouldn't explain extra items showing up.

      Do you know what I'm saying?

A.    Uh-huh.

Q.    So I guess I'm wondering why the extra items show up.

A.    That's what I wondered.  That's the reason I just pitched it.

(Lauersdorf Aff. Ex. 21 Pages 10-12.)

Viewing Breeden's testimony in the light most favorable to him as the nonmoving party, it creates a question of fact on the elements of Breeden's equitable estoppel defense.  Breeden's testimony describing his multiple discussions with Richards about the inventories reveals that Richards knew the number of persons living in Breeden's house at the time of the fire and that Richards made specific references to Breeden's children's and Hardin's children's belongings when

discussing the inventories' contents.  Breeden also explained that Richards told Breeden, his daughter, and Hardin's daughter to include personal property belonging to Hardin's sons, to exaggerate the value of the personal property by 20 to 30 percent and, arguably, to list higher quality items in the inventory (such as replacing a Black & Decker drill with a Craftsman drill).  In his affidavit, Breeden stated that Richards told "us" it would be acceptable to list the value of his personal property at its "current prices from catalogues and stores" and that "Allstate would probably not cover the property of Ms. Hardin, but that we should slip it in anyway." (Breeden Aff. ¶ 16, 18).

This evidence additionally shows that Richards intended Breeden to include items in his inventories that Richards knew either were overvalued or not covered by Allstate's policy.  Breeden testified that he followed this advice.  Richards also knew or had reason to know that Breeden would convey Richards's instructions to Breeden's children and Hardin's children.  Again, Breeden testified that he followed this advice; Breeden passed on to the others Richards's recommendations, and from this testimony and the inventories Breeden submitted reasonable minds could conclude that Breeden's family members followed Richards's recommendations when preparing their portions of the inventory.

Therefore, this court finds, once again, that this evidence is sufficient to support a prima facie claim of equitable estoppel and that denial of Allstate's summary judgment motion was appropriate.  Allstate has presented no newly discovered evidence, identified no intervening change in controlling precedent, or shown that the district court's prior decision resulted from clear error or was manifestly unjust, such that reconsideration is appropriate and its summary judgment motion should be granted.  Accordingly, Allstate's motion for reconsideration of the denial of its summary judgment motion on Breeden's second affirmative defense should be denied.

b.  Breeden's Fourth Affirmative Defense

Allstate also seeks reconsideration of the denial of its motion for summary judgment on Breeden's Fourth Affirmative Defense.  In his Fourth Affirmative Defense, Breeden alleges that Allstate's advances were not based on the inventories he prepared but were made in the ordinary course of business and that Allstate is not entitled to deny claims for misrepresentations made by parties other than the insured.  Breeden then alleges that Allstate fabricated its "reliance" argument in violation of Fed. R. Civ. P. 11 and in contempt of existing Oregon law.

Allstate's original argument that it is entitled to summary judgment on Breeden's Fourth Affirmative Defense is found in one paragraph which reads:

> Defendant's Fourth Affirmative Defense is nothing more than a denial that Allstate has relied on the misrepresentations of Defendant to its own detriment.  As such, it is not an appropriate basis for an affirmative defense, and should be dismissed or stricken.  In addition, Defendant's allegations in support of his Fourth Affirmative Defense are utterly unsupported, and Defendant cannot offer any competent evidence in support of such claims.  Accordingly, Allstate is entitled to summary judgment in its favor on Defendant's Fourth Affirmative Defense.

(Pl.'s Mem. Supp. Sum. J. 34).  The district court denied Allstate's motion based on the Ninth Circuit's 2005 decision in this case that genuine issues of material fact exist with regard to whether Allstate relied on Breeden's alleged misrepresentations to its financial detriment.  Allstate now asks this court to reconsider the district court's ruling, arguing that:

> Allstate moved for summary judgment on paragraphs 55 and 58 of Defendant's Answer and Counterclaims, which allege violations of FRCP 11 and "contempt" respectively.  This Court denied Allstate's motion for summary judgment on these paragraphs on the basis that the Ninth Circuit Court of Appeals "has already held that issue of fact exist with regard to whether Allstate relied on Breeden's misrepresentations." Opinion and Order, p 22, lines 17-20.  The issues raised in paragraphs 55 and 58 are issues that must be decided as a matter of law, however, and Allstate respectfully requests that the Court reconsider i[t]s previous rulings on these issues. *Kale v. Combined Ins. Co. of America*, 861 F[.]2d 746 (1st [Cir.] 1988).

(Pl.'s Mot. Re Mot.'s Having Dispositive Effect on Case at 4).

Allstate's original argument did not address paragraphs 55 and 58 specifically nor did it truly address the legal basis of the allegations and argue that issues actually were matters of law for the court's ultimate determination. Rather, in its original argument Allstate merely characterized the defense as a denial and argued that it was unsupported by the evidence; in other words, Allstate attacked the evidentiary, not legal, basis of Breeden's fourth affirmative defense. As quoted above, "[a] motion for reconsideration is an improper vehicle to tender new legal theories not raised in opposition to summary judgment." *All Hawaii Tours*, 116 F.R.D. at 650. Because Allstate's motion offers new theories not previously argued in support of its summary judgment motion, its motion for reconsideration should be denied.

### 2. Breeden's Motion for Reconsideration

Breeden asks this court to reconsider, for a second time, the district court's decision not address his arguments regarding the effect of his alleged fraudulent misrepresentations about his personal property loss on his dwelling loss claim, and whether an Oregon insurer is statutorily prohibited from contending that it owes less than the policy limits when the insured property has been determined to be a total loss. Breeden bases this second motion for reconsideration on Allstate's Second Amended Complaint, filed in February 2008, in which Allstate eliminates its second claim for relief based on the policy exclusion for faulty workmanship. Breeden argues that, as a result of the amendment, the cause of the fire is no longer an issue and this court is now free to address these arguments.

It is true that Allstate's Second Amended Complaint contains only one claim and that it seeks a declaration only on the ground that the policy is void based on Breeden's willful concealment or

misrepresentation of material facts. This argument overlooks that the cause of the fire remains as a potential issue in the case. At paragraph 52, Allstate alleges that "Defendant willfully concealed or misrepresented material facts or circumstances concerning the subject of this insurance, including the condition of the structure prior to the loss and potential causes of the fire that caused the loss." (Second Am. Comp. for Decl. J. at ¶ 52).[4] Clearly, these allegations keep the cause (or at least potential causes) of the fire at issue in this case. The basis for Breeden's second motion for reconsideration does not adequately demonstrate why the court should reconsider its prior decision again or set forth facts or law of a strongly convincing nature sufficient to convince this court that the Opinion and Order should be reversed. This court recommends denying Breeden's motion for reconsideration.

### 3. Breeden's Motion to Certify Questions to the Oregon Supreme Court

Allstate seeks to certify the following three questions of law to the Oregon Supreme Court:

1. ORS 742.200 prohibits an insurer from insuring a fire insurance policy which, with any existing insurance, exceeds the fair value of the risk insured. If a fire destroys a home to such an extent that it must be completely replaced, and if the fire destroys all contents of the home, leaving nothing salvageable, is the insurer estopped by its policy limits, and by ORS 742.200, from contending that it owes the insured less than the limits of the policy for dwelling coverage, and for contents coverage?

2. Where an insurer contends that an insured submitted a fraudulent inventory of the contents of a home following a fire but does not contend that the insured made any misrepresentation with respect to the coverage of the dwelling itself, and where there is no other exclusion in the policy for coverage of the dwelling, must the insurer pay dwelling coverage without regard to the ultimate determination of the fraud allegations with respect to the contents of the dwelling? Stated differently, does ORS 742.208 void all coverages of a policy, or only that coverage with respect to which the insured may have been found to have made misrepresentations?

---

[4]These allegations were not included in Allstate's Amended Complaint for Declaratory Relief and have not yet been answered by Breeden.

3.  a) Under the following circumstances would the Court adopt and apply the rule found at section 353 of the Restatement 2nd of Contracts (1981) which authorizes a claim for damages for emotional distress where the contract of the breach is of such a kind that serious emotional disturbance is a particularly likely result?

3.  b) Under the same circumstances would the Court allow an insured to bring a claim for intentional or reckless infliction of emotional distress, as well as a claim for breach of contract?

The court is not convinced that genuine issues of material fact do not exist with regard to the first two questions and that there is no controlling precedent in the State of Oregon with regard to the third question.

Both the first and second question assume that Allstate has abandoned any defense it has under the dwelling coverage of the policy.  In the first question, Breeden argues that if Oregon law prevents an insurer from issuing insurance in excess of the value of the property insured and the property is totally destroyed by a covered event, then the insurer is obligated to pay the policy limits and can not prove reliance on misrepresentations made by the insured with regard to the value of the property lost.  To illustrate Breeden's argument, if an insurer issues a policy for $100,000 on personal property under O.R.S. 742.200, the value of the personal property can not exceed $100,000. If that personal property is totally destroyed, the insurer is obligated to pay the insured the $100,000 even if the insured files a fraudulent inventory that lists personal property valued at $150,000. Because the property was a total loss and the insured was obligated under the policy to pay the $100,000, the insurer could not have detrimentally relied on the fraudulent inventory in paying the insured any portion of the $100,000 it owed the insured.

Here, Allstate issued Breeden an insurance policy covering his dwelling and his personal property.  Breeden argues that once it was determined that the dwelling and the personal property

was a total loss, Allstate was obligated to pay Breeden the policy limits. That Breeden allegedly misrepresented the value of the personal property is irrelevant because, in light of Allstate's obligation to pay the policy limits, there can be no detrimental reliance on the misrepresentations.

In the second question, Breeden argues that the alleged misrepresentations on his personal property inventory should not void the dwelling coverage – that, under Oregon law, the dwelling and personal property coverage are independent contracts of insurance and that, under the law, Allstate remains obligated to pay under the dwelling coverage even if it is determined that Breeden misrepresented the value of his personal property.

While these arguments might be persuasive if Breeden's alleged misrepresentations regarding his personal property were the only defense asserted by Allstate, Allstate's Second Amended Complaint clearly alleges a defense based on Breeden's concealment or misrepresentation of material facts relating both to the condition of the dwelling prior to the fire and to the potential causes of the fire that resulted in the loss. Even if the Oregon Supreme Court resolved the two questions in Breeden's favor and found that Breeden's misrepresentations regarding his personal property did not void either the dwelling coverage or personal property coverage, the question of whether Breeden's alleged misrepresentations regarding the condition of the house and the possible causes of the fire would still be at issue and could still void the policy under the concealment/fraud provision of the policy. Consequently, this court finds that disputed factual issues remain regarding the first two questions Breeden seeks to certify to the Oregon Supreme Court and that resolution of those questions would not necessarily be determinative of any claim. Because factual issues still exist, Breeden's questions are not questions of law, and because these facts questions must be decided by the trier of fact, determination of these questions would not be determinative of the case. Thus,

because all the requirements for certification to the Oregon Supreme Court are not met, certification is not appropriate. *Western Helicopter Servs. Inc. v. Rogerson Aircraft Corp.*, 311 Or. at 366.

Breeden's third question was specifically addressed and rejected by the court in its prior opinion. In the Opinion and Order, the court found that the Oregon Supreme Court had the opportunity to adopt Section 353 of the Restatement of Contracts 2d[5] and declined to do so after a thorough and detailed discussion of arguments substantially similar to those asserted by Breeden in his current motions. *Allstate Insurance Co. v. Breeden,* CV No. 01-1686-AS (D.Or. Dec. 17, 2007) construing *Keltner v. Washington*, 310 Or. 499 (1990). To the contrary, the Oregon Supreme Court reaffirmed that Section 341[6] of the Restatement of Contracts is the controlling law in the state of Oregon. *Keltner*, 310 Or. at 504. This court finds that the Oregon Supreme Court has already addressed the issues set forth in Breeden's third question and that certification of the question is not appropriate.

*Conclusion*

Allstate's motion (#209) and Breeden's motion (#210) for reconsideration, and Breeden's motion for certification (#215) should be DENIED.

―――――――――――――

[5]Section 353 provides "[r]ecovery for emotional disturbance will be excluded unless the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was  a particularly likely result."

[6]Section 341 provides that:

In actions for breach of contract, damages will not be given as compensation for mental suffering, except where the breach was wanton or reckless and caused bodily harm and where it was the wanton or reckless breach of a contract to render a performance of such a character that the defendant had reason to know when the contract was made that the breach would cause mental suffering for reasons other than mere pecuniary loss .

<u>Scheduling Order</u>

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due no later than **July 14, 2008**. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, any party may file a response within fourteen days after the date the

objections are filed. Review of the Findings and Recommendation will go under advisement when the response is due or filed, whichever date is earlier.

DATED this 27th day of June, 2008.

JOHN V. ACOSTA
United States Magistrate Judge